ROB BONTA
Attorney General of California
MARK BECKINGTON
Supervising Deputy Attorney General
JANE E. REILLEY
Deputy Attorney General
NICHOLAS R. GREEN
Deputy Attorney General
State Bar No. 323959
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102–7004
  Telephone:  (415) 510–4400
  Fax:  (415) 703–5480
  E-mail:  Nicholas.Green@doj.ca.gov
*Attorneys for Defendant*
*California Secretary of State*
*Shirley N. Weber, Ph.D.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **CALIFORNIA COUNCIL OF THE BLIND, ET AL.,**<br><br>                    Plaintiffs,<br><br>    v.<br><br>**SHIRLEY N. WEBER, PH.D.,**<br><br>                    Defendant. | Case No. 3:24-cv-01447-SK<br><br>**CALIFORNIA SECRETARY OF STATE SHIRLEY N. WEBER, PH.D.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        June 3, 2024<br>Time:       9:30 a.m.<br>Judge:     The Honorable Sallie Kim<br>Trial Date:  Not Set<br>Action Filed:  March 8, 2024 |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Statement Of The Issues To Be Decided .................................................................. 2

Background .................................................................................................................. 2

    I.     California's Election System ........................................................................ 2

    II.    The Vote-by-Mail Program .......................................................................... 5

    III.   RAVBM Ballot Marking ............................................................................. 7

    IV.   Facsimile Ballot Return for UOCAVA Voters ........................................... 8

    V.    This Litigation .............................................................................................. 9

Preliminary Injunction Standards ........................................................................... 10

Argument ................................................................................................................... 11

    I.     The Secretary Lacks Authority to Implement Plaintiffs' Requested Relief. ........ 11

    II.    The Court Should Deny Plaintiffs' Request for a Mandatory Injunction that Implicates the State's Administration of an Imminent Election. ....................... 16

    III.   Plaintiffs Have Failed to Establish a Likelihood of Success on the Merits. ......... 19

          A.    Plaintiffs have meaningful access to the vote-by-mail program ............... 20

          B.    Plaintiffs request a fundamental alteration of the vote-by-mail program. ................................................................................................ 22

    IV.   The Remaining Preliminary Injunction Factors Weigh In Favor of Denying Plaintiffs' Motion ............................................................................. 24

Conclusion ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*All. for the Wild Rockies v. Cottrell*
  632 F.3d 1127 (9th Cir. 2011) ................................................................. 11

*Am. Ass'n of People with Disabilities v. Shelley*
  324 F. Supp. 2d 1120 (C.D. Cal. 2004) ........................................... 21, 22

*Am. Council of the Blind of Ind. v. Ind. Election Comm'n*
  No. 1:20-cv-03118-JMS-MJD, 2022 WL 702257 (S.D. Ind. Mar. 9, 2022) ..............10, 17, 19

*Ass'n for Retarded Citizens v. Dep't of Developmental Servs.*
  38 Cal. 3d 384 (1985) ........................................................................... 14

*Bridgeman v. McPherson*
  141 Cal. App. 4th 277 (2006) ................................................................ 21

*Burdick v. Takushi*
  504 U.S. 428 (1992).............................................................................. 21

*Duvall v. Cnty. of Kitsap*
  260 F.3d 1124 (9th Cir. 2001) .............................................................. 19

*Feldman v. Ariz. Sec'y of State's Office*
  843 F.3d 366 (9th Cir. 2016) ................................................................ 18

*Garcia v. Google, Inc.*
  786 F.3d 733 (9th Cir. 2015) .......................................................... 10, 11

*Gonzales v. Gorsuch*
  688 F.2d 1263 (9th Cir. 1982) .............................................................. 12

*Howard Jarvis Taxpayers Ass'n v. Padilla*
  62 Cal. 4th 486 (2016) ........................................................................... 3

*Jacobson v. Fla. Sec'y of State*
  974 F.3d 1236 (11th Cir. 2020) ............................................................ 16

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*
  725 F.3d 1088 (9th Cir. 2013) .............................................................. 20

*M.S. v. Brown*
  902 F.3d 1076 (9th Cir. 2018) .............................................................. 15

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*
  571 F.3d 873 (9th Cir. 2009) ................................................................ 11

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Merrill v. Milligan*
142 S. Ct. 879 (2022) ............................................................................................ 16, 17, 18

*Miles v. Apex Marine Corp.*
498 U.S. 19 (1990) ............................................................................................................ 21

*Nat'l Fed. of the Blind of Ala. v. Allen*
661 F. Supp. 3d 1114 (N.D. Ala. 2023) ......................................................................... 15

*Physicians & Surgeons Labs., Inc. v. Dep't of Health Servs.*
6 Cal. App. 4th 968 (1992) .............................................................................................. 14

*Purcell v. Gonzalez*
549 U.S. 1 (2006) ....................................................................................................... *passim*

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*
415 F.3d 1078 (9th Cir. 2005) ........................................................................................ 12

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*
589 U.S. 423 (2020) ......................................................................................................... 16

*Riley v. Kennedy*
553 U.S. 406 (2008) ......................................................................................................... 17

*Shavelson v. Bonta*
608 F. Supp. 3d 919 (N.D. Cal. 2022) ........................................................................... 24

*Storer v. Brown*
415 U.S. 724 (1974) .................................................................................................... 21, 22

*Sw. Voter Registration Educ. Project v. Shelley*
344 F.3d 914 (9th Cir. 2003) ............................................................................... 16, 17, 25

*Wash. Env't Council v. Bellon*
732 F.3d 1131 (9th Cir. 2013) ................................................................................... 11, 12

*Weber v. Shelley*
347 F.3d 1101 (9th Cir. 2003) ........................................................................................ 21

*Where Do We Go Berkeley v. Cal. Dep't of Transp.*
32 F.4th 852 (9th Cir. 2022) ...................................................................................... 10, 22

**STATUTES**

United States Code, Title 52
§ 10508 ............................................................................................................................. 21

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3
Act of July 22, 2016, 2016 Cal. Leg. Serv. Ch. 75 (A.B. 2252) (West 2024) ............................... 7

4
Act of Sep. 27, 2021, 2021 Cal. Leg. Serv. Ch. 312 (A.B. 37) (West 2024)............................. 13

5
California Elections Code

6
§ 1......................................................................................................................... 3
§ 300................................................................................................................ 8, 14

7
§ 303.3......................................................................................................... 4, 7, 8
§ 320..................................................................................................................... 3

8
§ 354.5................................................................................................................. 14

9
§ 362............................................................................................................... 4, 23
§ 2102................................................................................................................... 3

10
§ 2183................................................................................................................... 3
§ 3000.5...................................................................................................... 3, 5, 10

11
§ 3003................................................................................................................... 5
§ 3010................................................................................................................... 5

12
§ 3011............................................................................................................. 5, 14

13
§ 3016.7............................................................................................................... 7
§ 3017......................................................................................................... 3, 5, 14

14
§ 3019......................................................................................................... 3, 5, 6
§ 3106....................................................................................................... 8, 9, 14

15
§ 12220................................................................................................................. 3

16
§ 12280................................................................................................................. 3
§ 13202................................................................................................................. 7

17
§ 13207................................................................................................................. 7
§ 13214-15............................................................................................................ 7

18
§ 15150................................................................................................................. 3

19
§ 15371................................................................................................................. 3
§ 15375................................................................................................................. 3

20
§ 19202................................................................................................................. 4
§ 19205...................................................................................................... 4, 14, 24

21
§ 19281................................................................................................................. 4
§ 19295.......................................................................................................... 8, 14

22

23
California Government Code
§ 12172.5................................................................................................. 3, 4, 13, 15

24
Public Law 97-205, § 5 (June 29, 1982)........................................................... 21

25
Public Law 101-336, Title II, § 202 (July 26, 1990) ....................................... 21

26
OTHER AUTHORITIES

27
Code of Federal Regulations, Title 28

28
§ 35.130(b)(7)(i) ................................................................................................. 22

iv

**INTRODUCTION**

California provides substantial accommodations for voters with print disabilities, including a system that enables voters to receive, read, and mark their ballots electronically with the use of their own preferred assistive technology before mailing them to their local county election officials. But even in view of this meaningful access to the ballot, Plaintiffs ask the Court to issue an extraordinary, mandatory preliminary injunction forcing the State's 58 counties to implement an "e-return" method featuring electronic signatures in the short time that remains before the November election.

Such an order would significantly alter California's vote-by-mail program. California's longstanding vote-by-mail program has *always* required hand signatures for verification purposes. California has likewise *never* authorized voters to return their completed mail ballots over the Internet. These two essential components of the vote-by-mail program are statutory requirements that reflect the California Legislature's considered judgment. They are intended to ensure the accuracy, security, and integrity of the State's elections.

Plaintiffs contend that these aspects deny them meaningful access to the vote-by-mail program due to their print disabilities, which impact their ability to see and handle paper materials. Secretary Weber recognizes Plaintiffs' interest in exercising their franchise and she is committed to promoting ballot access for all California voters, including voters with print disabilities. But as core requirements of the Elections Code, the Secretary has *no authority* to alter the wet-ink signature requirement or to authorize Internet voting. Moreover, she does not possess independent authority to compel California's 58 counties to accept ballots from voters with print disabilities that have been verified electronically or transmitted by "e-return," as Plaintiffs request. For that reason alone, Plaintiffs' motion should be denied.

And although Plaintiffs strive to paint their request as a modest one, that is simply not the case. Plaintiffs' request for hastily imposed, significant changes to the vote-by-mail rules would vitiate carefully calibrated legislative policy and dramatically alter the status quo. This kind of mandatory relief is strongly disfavored as a general rule, and Plaintiffs' burden is even higher where—as here—they seek a federal court's intervention in the State's administration of an

1

imminent election. To state it plainly, the changes Plaintiffs propose are a fundamental departure from the State's longstanding signature and mail ballot return policies. Implementing them without careful planning, testing, and review, and on a compressed timeline, would be resource-intensive and could pose grave risks for the accuracy and security of the forthcoming election. For at least these reasons, granting Plaintiffs' request would be improper under existing precedent, unauthorized under the federal disability laws, and unnecessary in light of present meaningful access to the vote-by-mail system for voters with print disabilities.

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Whether Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims because they lack standing under Article III to the United States Constitution, where their injuries cannot be redressed by the Secretary of State.

2. Whether the rule articulated in *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) precludes an injunction in this case, where Plaintiffs seek mandatory relief from a federal court that would interfere with the State's administration of an imminent election.

3. Whether Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims because the State's vote-by-mail program is facially neutral and the Remote Accessible Vote-By-Mail ("RAVBM") system provides Plaintiffs with meaningful access.

4. Whether Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims because they seek a mandatory injunction that would work a fundamental alteration in the State's vote-by-mail program.

5. Whether Plaintiffs request for a mandatory injunction should be denied in view of the strong public interest in the accuracy, security, and integrity of the forthcoming general election.

## BACKGROUND

### I.   CALIFORNIA'S ELECTION SYSTEM

Three separate sources of authority establish and regulate California's elections system: the Legislature, the 58 counties, and the Secretary of State. Broadly speaking, the California Constitution vests the Legislature with plenary power to issue uniform rules for the conduct of

2

elections. *See*, *e.g.*, *Howard Jarvis Taxpayers Ass'n v. Padilla*, 62 Cal. 4th 486, 498 (2016) ("the California Legislature possesses plenary legislative authority except as specifically limited by the California Constitution."). The Legislature's state-wide policy choices are reflected in the Elections Code, which provides a comprehensive set of generally applicable rules governing elections in California. *See generally* Cal. Elec. Code § 1, *et seq.*; *see also* Declaration of Jana Lean ("Lean Decl.") ¶ 7.[1]

When it comes to actually administering elections, however, California's system is at its heart a local one; each of the State's 58 counties are responsible for elections held in their respective jurisdictions. *See* Lean Decl. ¶ 8. Indeed, the Elections Code defines an "[e]lections official" as a "person who is charged with the duty of conducting an election," including "[a] county clerk, city clerk, registrar of voters, or elections supervisor having jurisdiction over elections within any county, city, or district within the state." § 320(a). "Elections officials"—*i.e.*, local and county officials—are responsible for, among other things: processing voter registrations (§ 2102(a)); maintaining a roster of registered voters (§ 2183); dividing their jurisdiction into precincts (§ 12220); designating polling places (§ 12280); mailing ballots to every registered voter in advance of elections (§ 3000.5); collecting mail ballots (§ 3017); verifying signatures on mail ballots (§ 3019); counting both in-person and mail ballots (§§ 15150, 15371); and reporting final results to the Secretary of State (§ 15375).

As the state's chief elections officer, the Secretary of State is charged with "administer[ing] the provisions of the Elections Code[,]" as well as seeing that "elections are efficiently conducted and that state election laws are enforced." Cal. Gov't Code § 12172.5(a). The Secretary may assist local county elections officials in carrying out their duties under the Elections Code, but it is ultimately up to the counties to comply with the statutory rules applicable to them. *See* Lean Decl. ¶ 9. When the Secretary believes a local elections official is not in compliance with the Legislature's requirements as reflected in the Code, she is encouraged to "assist the county elections officer in discharging the officer's duties." *Id.* § 12172.5(b). If "the Secretary of State concludes that state election laws are not being enforced, the Secretary of State shall call the

[1] Unless otherwise indicated, all statutory citations are to the California Elections Code.

violation to the attention of the district attorney of the county or to the Attorney General." *See id*. County elections officials are independent from the Secretary's office, and she does not control their day-to-day operations.

The Legislature has also charged the Secretary with certifying components of the State's electoral machinery, including voting systems and Remote Accessible Vote-By-Mail ("RAVBM") systems. *See* §§ 19202 (voting systems); 19281 (RAVBM systems). Although the Secretary must *certify* voting systems, she cannot order a county to *implement* any given system. *See* Lean Decl. ¶ 14; Declaration of NaKesha Robinson ("Robinson Decl.") ¶ 5. Instead, individual counties are free to choose among certified systems and, so long as their choice complies with the Elections Code, they may choose not to offer a particular certified system. Lean Decl. ¶ 14; Robinson Decl. ¶ 5. Only the Legislature, through an amendment to the Elections Code, may compel the counties to implement any particular voting system. *See* Lean Decl. ¶ 15.

A "voting system" is defined in the Elections Code as "a mechanical, electromechanical, or electronic system and its software, or any combination of these used for casting a ballot, tabulating votes, or both." § 362. In other words, voting systems are the systems used at polling places and mail-ballot counting centers to record voter choices and count votes. *See* Robinson Decl. ¶ 3. Because the Elections Code prohibits any voting system from being connected to the Internet at any time, the Secretary is barred from certifying any voting system that is so capable.[2] § 19205; *see* Robinson Decl. ¶ 6. In contrast to a voting system used to cast or tabulate votes, under California law a RAVBM is a "mechanical, electromechanical, or electronic system and its software that is used *for the sole purpose of marking an electronic vote by mail ballot* for a voter who shall print the paper cast vote record to be submitted to the elections official." § 303.3 (emphasis added).

The certification processes for voting systems and RAVBMs are lengthy and expensive— they can take over a year to complete and may cost up to $500,000, depending on the nature of the system. Robinson Decl. ¶ 8. The Secretary retains an outside consultant to assist with testing

---

[2] In practice, all voting systems in California are "air gapped," meaning they are physically separated from Internet connections. *See* Robinson Decl. ¶ 6.

4

each system's functionality, usability (including accessibility for disabled voters), and security, among other aspects. *Id.* ¶ 9. California utilizes standards that meet or exceed federal guidelines for voting system certification. *Id.* ¶ 4. When the testing process is complete, the Secretary issues a final report that is available to the public. *Id.* ¶ 10. Reporting is followed four weeks later by a notice and comment period and a public hearing. *Id.* If the Secretary grants certification, she generally includes a set of implementation requirements. *Id.* ¶ 11. These same general procedures also apply to RAVBM systems and other systems that the Secretary must certify. *Id.* ¶ 27.

## II.   THE VOTE-BY-MAIL PROGRAM

For more than a decade, every registered voter in California has had the option of voting by mail. *See* Robinson Decl. ¶ 14; § 3003 ("The vote by mail ballot shall be available to any registered voter"). In 2021, the Legislature amended the Elections Code to require all counties to automatically mail ballots to every registered voter. § 3000.5. Although the specific mechanics of the vote-by-mail program have varied in some respects over the years, the Legislature has always required all mail voters to place their vote-by-mail ballot in an envelope, and then hand sign or mark that envelope, before returning their ballot to their county election officials. *See* Robinson Decl. ¶ 16.

Current law requires county election officials to mail a pre-paid "identification envelope" for voters to use when returning their ballots. § 3010(a)(2). The identification envelope has places for the voter to sign and date, and it must include "[a] warning plainly stamped or printed on it that the voter must sign the envelope in the voter's own handwriting in order for the ballot to be counted." § 3011(a)(6). After completing their ballots and signing their identification envelopes, vote-by-mail voters may return them in any of three ways: (1) by mail; (2) in person to a local county election official; or (3) at a ballot drop-box anywhere within the State. *See* § 3017(a)(1).

When county election officials receive mail ballots, they must begin by comparing the voter's signature on the identification envelope with the signature that the official has on file for that voter (usually from the voter's affidavit of registration or Department of Motor Vehicle records) to ensure that the ballot was submitted by the person lawfully entitled to cast it. *See* § 3019(a)(1); Robinson Decl. ¶ 17. If the county elections officer determines that the signature on

5

the identification envelope matches the signature on file, the county elections officer accepts the ballot for later tabulation. § 3019(b).

Robust procedures apply when a county elections official determines that the signature on an identification envelope does not match the signature on file for the voter. *See* § 3019(c)–(d). County elections officials must mail a notice to the voter within one business day that includes a signature verification statement and a pre-paid means of returning the signed verification, § 3019(d)(1)(A), and may finally reject a ballot only if the voter's signature on the verification statement also fails to match the signature on file for the voter. § 3019(d)(4)(A)(ii). Similar procedures apply where a voter neglects to sign their envelope. § 3019(e).

California's vote-by-mail program currently does not allow any voter to sign or otherwise certify their vote-by-mail identification envelope electronically. Robinson Decl. ¶ 20. Changing the vote-by-mail program to allow electronic signatures would require county elections officials to collect comparison electronic signatures to keep on file, verify the legitimacy of those electronic signatures, and provide voters with an avenue to cure any potential discrepancies between their electronic signatures. *Id.* Electronic signatures may also raise new and different concerns related to forgery and misuse than those implicated by handwritten signatures. *Id.* County elections officials would thus need to ensure that they have the infrastructure and hardware (including, but not limited to, technological devices capable of recording, comparing, and verifying electronic signatures) and training necessary to reliably verify voters' electronic signatures. *Id.* Each county would need to make corresponding changes to its elections website to inform voters of the new system and conduct related voter outreach. *See id.* ¶ 36. Those materials would need to be translated into several languages, as required by the Elections Code. *See id.* ¶ 36.

Given that the State's 58 counties differ greatly from each other in terms of their election office's size, capacities, and resources, the amount of time, labor, and expense such changes would require would vary greatly among the counties. *Id.* Some counties might need to hire additional staff. *See id.* ¶ 39. Likewise, because California has no means of determining how

1    many voters might qualify as voters with print disabilities under Plaintiffs' proposed definition, it

2    is impossible to determine the scope of these potential burdens. *See* Robinson Decl. ¶¶ 13, 22, 42.

3    ### III.   RAVBM BALLOT MARKING

4         In 2016, the Legislature approved the use of certified RAVBM systems as an adjunct to the

5    vote-by-mail program. *See* Act of July 22, 2016, 2016 Cal. Legis. Serv. Ch. 75 (A.B. 2252) (West

6    2024). Recall that, unlike a voting system, a RAVBM "is used *for the sole purpose of marking an*

7    *electronic vote by mail ballot* for a voter who shall print the paper cast vote record to be

8    submitted to the elections official." § 303.3 (emphasis added). In other words, RAVBMs may not

9    have the capability to cast or tabulate votes; they are strictly a mechanism for sending and

10   marking a blank ballot. California RAVBM systems allow voters to receive blank ballots over the

11   Internet, download a local copy to their computer, and mark them electronically (using

12   compatible assistive technology, if desired). *See* Robinson Decl. ¶ 22. After electronically

13   marking their RAVBM ballot, the voter must print a paper copy of their selections, place that

14   paper copy into an envelope, sign that envelope, and return it to their local elections official. *See*

15   *id*. Current law requires all California counties to offer a RAVBM system and to permit "any

16   voter" to mark their selections using that RAVBM system. *See* § 3016.7; *see also* Robinson Decl.

17   ¶ 21 (California does not require voters to prove or attest they have a disability in order to use the

18   RAVBM system).

19        Just as with all vote-by-mail voters, voters who use an RAVBM system must hand-sign or

20   mark the outside of the envelope containing their selections before returning it, in order to allow

21   their county elections official to verify the voter's identity.

22        The Elections Code refers to RAVBM print-outs as "paper cast vote records" because they

23   differ from actual ballots. *See* Robinson Decl. ¶ 24. For example, they may be printed out on

24   different size paper. *See id*. They also lack the formatting and security features the Elections Code

25   requires of actual paper ballots. *See id*.; *see also* §§ 13202; 13207; 13214–15 (setting forth

26   various ballot printing requirements). Voters that elect to use an RAVBM system must also

27   complete an attestation that acknowledges, among other things, that county election workers will

28   transfer their selections—as indicated on their paper cast vote record—onto an actual ballot

before the voter's choices can be tallied using regular voting systems. *See id.* ¶ 25. This process, referred to as "duplicating" a paper cast vote record, necessarily requires local election officials to review a voter's choices and confirm that they are entering them on the correct official ballot for that voter. *See id.* ¶¶ 24–25.

Longstanding California policy prohibits exposing voter choices to the Internet, so the Elections Code forbids RAVBMs from performing certain functions that would involve Internet communications. *See* Robinson Decl. ¶ 28. Of particular relevance, RAVBMs cannot be used for returning a voter's choices to county election officials and may not connect to a system that actually casts or tabulates votes (*i.e.*, a voting system). § 303.3 ("[a] [RAVBM] system shall not be connected to a voting system at any time."). Likewise, an RAVBM may not "[h]ave the capability. . . to use a remote server to mark a voter's selections transmitted to the server from the voter's computer via the Internet." § 19295(a). In other words, California voters using RAVBM systems can only mark their ballots after pulling them down from the public Internet and saving them on their local computer. *See* Robinson Decl. ¶ 22. Because the Elections Code forbids RAVBMs from *returning* a marked ballot to a local elections official over the Internet, the Secretary has no authority to certify an RAVBM that performs this function. *See* Lean Decl. ¶ 12. These rules exist for a simple reason: to ensure that RAVBM voter choices are never exposed to the public Internet or a hackable remote server, where they could be more easily accessed or manipulated by malicious third-parties. *See* Robinson Decl. ¶ 28.

## IV.   FACSIMILE BALLOT RETURN FOR UOCAVA VOTERS

In addition to electronic RAVBM marking, members of the military and overseas voters have the option of returning paper cast vote records by facsimile transmission. § 3106; Robinson Decl. ¶ 31. These voters are sometimes referred to as "UOCAVA" voters, after the federal Uniformed and Overseas Citizen Absentee Voting Act. To qualify, UOCAVA voters must be "absent from the county in which" they are "otherwise eligible to vote," and either "[a] member of the active or reserve components" of the armed forces or "living outside the territorial limits of the United States or the District of Columbia." § 300(b).

8

Fax voting is discouraged as an alternative to normal mail-ballot return. In keeping with California's strong policy preference, UOCAVA voters are "encouraged to return their ballot by mail or in person if possible[,]" and UOCAVA voters "should return a ballot by facsimile transmission only if doing so is necessary for the ballot to be received before the close of polls on election day." § 3106(d).[3]

UOCAVA voters who choose to return a paper cast vote record by fax *must print their paper cast vote records and physically sign* an "oath of voter declaration" before faxing it. And, just as with RAVBM voters, a UOCAVA voter's signature is used to verify the voter's identity and the faxed paper cast vote record must be duplicated onto an actual ballot. Robinson Decl. ¶ 32. Importantly, UOCAVA voters must also *waive their right to a secret ballot*. § 3106(a). Faxed ballots arrive at local county election offices as fax printouts, so it is impossible to preserve secrecy. *See* Robinson Decl. ¶ 33.

The Elections Code does not permit UOCAVA voters to return their paper cast voting records to their county elections offices via email or any other form of Internet transmission, nor does it permit voters to sign their UOCAVA oath and declaration page electronically. *See* Robinson Decl. ¶ 34.

## V.   THIS LITIGATION

Plaintiffs filed their Complaint on March 8, 2024, contending that the State's vote-by-mail program includes "paper-based requirements" that deny them "their fundamental right to vote privately and independently." Compl., ECF No. 1, ¶ 8 (Mar. 8, 2024). These "paper-based requirements" include printing their RAVBM ballots, signing them, and returning them in hardcopy to their local county elections office. *Id.* ¶ 28. The Complaint asserts violations of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 *et seq.*, and Cal. Gov't Code § 11135(a). *Id.* ¶ 10. Plaintiffs request both declaratory and injunctive relief, including an order that the Secretary "certify a [RAVBM] system with an accessible electronic ballot return option[.]" *Id.* ¶ 79.

---

[3] Although the Elections Code uses the term "ballot" in Section 3106, UOCAVA voters who use an RAVBM to mark their choices print out a "paper cast vote record," just as any other voter using an RAVBM system would.

1    Plaintiffs did not file their motion for a preliminary injunction until April 4, 2024, after

2    effecting service on the Secretary on March 26, 2024. *See* Notice of Mot. & Mot. for Prelim. Inj.,

3    ECF No. 12 (Apr. 4, 2024) ("Mot."); Proof of Serv., ECF No. 32 (Apr. 22, 2024). Plaintiffs'

4    motion requests different relief than that requested in the Complaint's prayer for relief: they "seek

5    an order requiring" the Secretary to "immediately make available" "facsimile-based ballot return

6    procedures" that include "no paper based steps." Mot. at 1, 7. Even under the Court's default

7    schedule, the hearing on Plaintiffs' preliminary injunction could have occurred no earlier than

8    May 13, 2024, just five months before the State must begin mailing ballots on October 7, 2024.

9    *See* Civil L.R. 7-2. As it stands, the hearing on Plaintiffs' motion will occur roughly four months

10   before the State's vote-by-mail program begins. *See* § 3000.5(a) (requiring local election officials

11   to mail ballots no later than 29 days before date of election); Lean Decl. Ex. A (calendar of key

12   election dates).

13        In the meantime, organizations affiliated with the Plaintiffs here—and some of the same

14   lawyers litigating this case on Plaintiffs' behalf—filed similar lawsuits around the country

15   beginning as early as December 2020. *See, e.g.*, *Am. Council of the Blind of Ind. v. Ind. Election*

16   *Comm'n*, No. 1:20-cv-03118-JMS-MJD, 2022 WL 702257, at *2 (S.D. Ind. Mar. 9, 2022) (noting

17   plaintiffs filed suit on December 3, 2020); *Nat'l Fed. of the Blind of Ala., et al. v. Merrill*, No.

18   2:22-cv-00721-JHE, Compl., ECF No. 1 (N.D. Ala. June 8, 2022)). In other words, the same

19   lawyers involved in this case chose to pursue similar litigation almost *four years* before the

20   forthcoming presidential election in other jurisdictions. Not so in California, where Plaintiffs'

21   strategy leaves mere months to implement Plaintiffs' requested changes to the vote-by-mail

22   system.

23                          **PRELIMINARY INJUNCTION STANDARDS**

24        Preliminary injunctions are "an 'extraordinary remedy never awarded as of right.'" *Garcia*

25   *v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Winter v. Nat'l Res. Def. Council*, 555

26   U.S. 7, 24 (2008)). Plaintiffs must establish that "(1) they are likely to succeed on the merits, (2)

27   they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips

28   in their favor, and (4) an injunction is in the public interest." *Where Do We Go Berkeley v. Cal.*

*Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022). A plaintiff must make a showing on all four of the above factors to obtain a preliminary injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

A preliminary injunction is usually intended to preserve the status quo. *See, e.g.*, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–89 (9th Cir. 2009). "[A] mandatory injunction," however, "goes well beyond simply maintaining the status quo" and is "particularly disfavored." *Garcia*, 786 F.3d at 740 (internal quotation omitted). A "district court should deny such relief unless the facts and law *clearly favor* the moving party." *Id.* at 740 (internal quotation marks omitted) (emphasis added).

## ARGUMENT

The Court should deny Plaintiffs' motion for at least five reasons. **First**, the Secretary has no authority to make the changes Plaintiffs seek. So, the Court cannot redress the injuries Plaintiffs assert and accordingly lacks Article III jurisdiction. **Second**, under the principle described in *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), this federal court should decline to exercise its equitable powers with respect to the State's administration of an imminent election. **Third**, Plaintiffs cannot succeed on the merits of their claims because the State already offers "meaningful access" to the vote-by-mail program for voters with print disabilities. **Fourth**, Plaintiffs seek a fundamental alteration of the relevant program, California's vote-by-mail system. **Fifth**, the public has a compelling interest in the accuracy and integrity of the forthcoming election that weighs heavily against granting an injunction.

## I.   THE SECRETARY LACKS AUTHORITY TO IMPLEMENT PLAINTIFFS' REQUESTED RELIEF.

The Secretary has no authority to implement the ballot return methods Plaintiffs request, and Plaintiffs therefore lack one of the three "irreducible constitutional minimum" requirements for standing: redressability. This is a stand-alone reason to dismiss Plaintiffs' suit. *See generally Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1138 (9th Cir. 2013) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." (quoting Fed. R. Civ. P. 12(h)(3)). It follows, then, that Plaintiffs have failed to demonstrate *any* likelihood of

11

1   success on the merits of their claims. *See, e.g.*, *Ranchers Cattlemen Action Legal Fund United*

2   *Stockgrowers of Am. v. USDA*, 415 F.3d 1078, 1104 (9th Cir. 2005) (reversing grant of

3   preliminary injunction where plaintiffs lacked standing).

4       To establish Article III standing, "a plaintiff must satisfy three 'irreducible constitutional

5   minimum' requirements," one of which is that their claimed "injury is likely to be redressed by a

6   favorable court decision." *Bellon*, 732 F.3d at 1139–40 (quoting *Lujan v. Defenders of Wildlife*,

7   504 U.S. 555, 560–61 (1992)). Because an order directed to a party that is powerless to

8   implement it does nothing to resolve a plaintiff's injury, "if the wrong parties are before the

9   court . . . the plaintiff lacks standing." *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982).

10  It is Plaintiffs' burden to demonstrate their standing. *See Bellon*, 732 F.3d at 1139.

11      Plaintiffs contend that their claimed injuries can be redressed through accessible "fax-based

12  ballot return [.]" Mot. at 7. Plaintiffs further request that those "fax-based processes" include "no

13  paper-based steps," but fail to cite evidence explaining how their proposal might be implemented

14  in practice. *Id.* Nevertheless, Plaintiffs repeatedly refer to their requested relief as "e-return"

15  throughout their motion. *See, e.g.*, Mot. at 3 ("California must provide voters with print

16  disabilities with an accessible electronic method for returning their vote-by-mail ballots ('e-

17  return')"); *id.* at 19 ("the e-return mechanism that Plaintiffs ask for here"). Leaving to one side

18  the fact that this request appears nowhere in Plaintiffs' prayer for relief, the Secretary understands

19  Plaintiffs to be requesting "electronic fax" or "e-fax" technology, which *transmits voter choices*

20  *over the Internet*. Indeed, Plaintiffs specifically invoke "e-fax" in their declarations and describe

21  it as "*akin to sending an email containing an attachment.*" *See, e.g.*, Griffith Decl., ECF No. 13 at

22  ¶ 9 (emphasis added); Gray Decl., ECF No. 16 at ¶ 7 ("e-fax"); Elder Decl., ECF No. 14, at ¶ 11.[4]

23      In addition to the significant implementation and security concerns discussed in detail

24  below (*see* Section II, *infra*), there is a fundamental problem with this request: the Secretary

25  *cannot* make fax-based ballot return procedures available to Plaintiffs because she has no

26  authority to approve that form of ballot return—in other words, there is nothing in the Elections

---

27  [4] If Plaintiffs seek something other than e-fax return, they have failed to state the relief sought
28  "with particularity." *See* Fed. R. Civ. Proc. 7(b)(1)(B)–(C).

1   Code that permits the Secretary to establish e-fax *or* fax return for voters with print disabilities.

2   More importantly, even if the Secretary could authorize e-fax or fax return, she would have no

3   power to compel the counties to accept ballots in that manner. *See* Lean Decl. ¶ 16. Instead, the

4   counties are required to accept ballots only as authorized by the Legislature through the Elections

5   Code. *See* Lean Decl. ¶ 15. An example is illustrative: the Secretary could not, on her own, have

6   *ordered* the counties to automatically mail ballots to every registered voter, regardless of her view

7   of the wisdom of the policy. *Id.*; Robison Decl. ¶ 15. To effect that change, the Legislature

8   amended the Elections Code in 2021 to extend the requirement state-wide. *See* Act of Sep. 27,

9   2021, 2021 Cal. Leg. Serv. Ch. 312 (A.B. 37) (West 2024).

10       Plaintiffs identify only a scattershot group of unrelated powers: (1) the Secretary's

11   obligation to *certify* election systems, which does not empower the Secretary to order counties to

12   use any particular system, Mot. at 16; (2) her authority to regulate the use of RAVBM systems,

13   which are not the systems Plaintiffs ask the Secretary to implement through this motion and

14   which are statutorily barred from transmitting votes in any case, Mot. at 16; and (3) her authority

15   over the UOCAVA voting process, which is not at issue in this litigation brought by *in-state*

16   voters and which in any event also requires voters to hand-sign their paper cast vote records and

17   waive their right to a secret ballot—the very things Plaintiffs seek to change. Mot. at 10. In short,

18   none of this supports the notion that the Secretary could compel the counties to accept e-fax or

19   fax ballots from voters with print disabilities. Even an order from this Court compelling the

20   Secretary to "immediately make available" e-fax or fax return would not provide Plaintiffs with

21   the relief they seek, Mot. at 1, because the Secretary could not compel the counties to adopt that

22   procedure. *See* Robinson Decl. ¶ 5; Lean Decl. ¶ 16.

23       Plaintiffs do not invoke the Secretary's general rule-making powers as a basis for her

24   authority to implement electronic signatures and e-fax return, and for good reason. Although the

25   Government Code provides that "[t]he Secretary of State may adopt regulations to ensure the

26   uniform application and administration of state election laws," Cal. Gov't Code § 12172.5(d), that

27   grant of authority does not permit the Secretary to promulgate regulations that are directly

28   contrary to self-executing provisions of the Elections Code. Under black-letter California law,

"[a]dministrative action that is not authorized by, or is inconsistent with, acts of the Legislature is void." *Ass'n for Retarded Citizens v. Dep't of Developmental Servs.*, 38 Cal. 3d 384, 391 (1985).

Here, the relevant statutes are unambiguous. Signatures must be either "written" or made using a "signature stamp." § 354.5. A vote by mail ballot must be returned in an identification envelope that includes "[t]he signature of the voter." § 3011(a)(2). And if that wasn't clear enough, the Elections Code provides that identification envelopes must inform voters that the signature must be "in the voter's own handwriting[.]" § 3011(a)(7). The Code is likewise explicit that there are only three permissible means of returning a vote-by-mail ballot: "by mail," "in person," or "by mail ballot dropoff location." § 3017(a)(1). Facsimile ballot return, in contrast, is specifically limited to "military or overseas voter[s]," § 3106(a), who are defined as voters that are "absent from the county in which" they are "otherwise eligible to vote," and who are either "[a] member of the active or reserve components" of the armed forces or "living outside the territorial limits of the United States or the District of Columbia." § 300(b). And of course, using the Internet to transmit paper cast vote records, cast votes, or tabulate votes are all expressly prohibited. §§ 19205, 19295(a).

These statutes leave no room for agency interpretation or enlargement and the Secretary has no authority to alter them by rulemaking. *See, e.g.*, *Physicians & Surgeons Labs., Inc. v. Dep't of Health Servs.*, 6 Cal. App. 4th 968, 982 (1992) ("regulations that alter or amend the statute or enlarge or impair its scope are void."). This means that, even if the Secretary agrees that implementing the changes Plaintiffs request here would be wise policy, she cannot implement them on her own.

Consider an alternative framing: imagine a situation in which the Court has ordered the Secretary to "immediately make available" e-fax return for the November election. *See* Mot. at 1. Such an order would implicate significant practical feasibility and security problems, as explained below, and would require the Secretary to endorse a system specifically prohibited by multiple Elections Code provisions and which she has no authority to implement. More importantly, however, an order requiring the Secretary to "immediately make available" the requested system would have no guarantee of providing Plaintiffs with any relief. If a county refused to accept e-

14

1    fax return for one of any number of reasons (*i.e.*, security concerns related to exposing voter

2    choices to the Internet), the Secretary would have no means of requiring the county to accept the

3    e-faxed ballots. The only way the Court could ensure that the counties accept e-fax or fax return

4    from voters with print disabilities would be to order *the counties* to do so. But of course, Plaintiffs

5    have not named the counties as defendants and they are thus not before the Court. In sum, there is

6    no order the Court could fashion that would provide Plaintiffs with the relief they seek given the

7    current parties.[5]

8          Where a state official lacks "the statutory authority" to grant a plaintiff's requested relief,

9    the plaintiff has failed to establish redressability. *See M.S. v. Brown*, 902 F.3d 1076, 1084 (9th

10   Cir. 2018). That rule governs this case. An Alabama district court considering substantially

11   similar litigation brought by the National Federation of the Blind reached the same conclusion.

12   *See Nat'l Fed. of the Blind of Ala. v. Allen*, 661 F. Supp. 3d 1114, 1123 (N.D. Ala. 2023). In

13   Alabama, the Secretary of State is charged with creating standards for absentee ballots but county

14   "absentee election managers" are charged with administering the process of distributing,

15   collecting, and counting the ballots. *See id.* at 1118. The *Allen* court emphasized that, under

16   Alabama law, the Secretary of State lacked "the authority to promulgate rules to provide an

17   electronic voting option to *any* domestic voters[.]" *Id.* at 1121 (emphasis in original). The Court

18   further observed that the Alabama Secretary of State's rulemaking authority "is limited by

19   legislative directives." *Id.* at 1122. In view of that statutory framework—which in critical respects

20   mirrors California's—the Court concluded that "Plaintiffs fail to show redressability because

21   third parties, not the defendant Secretary, would have to implement Plaintiffs' requested relief."

22   *Id.* at 1123. Just so here, where the Secretary has no power to force county officials to accept the

23   "e-return" method Plaintiffs seek.

24         The Secretary's statutory designation as the State's "chief election officer," Cal. Gov't

25   Code § 12172.5(a), does not change the analysis. In a similar case, the Eleventh Circuit concluded

26   that the Florida Secretary of State's status as "the chief election officer of the state" did not mean

---

[5] Plaintiffs decision to name a county defendant in prior, similar litigation reflects their
understanding of this reality. *See Cal. Council of the Blind, et al. v. Cnty. of San Mateo, et al.*, No.
3:15-cv-05784-CRB, 1st Am. Compl. ECF No. 30 (N.D. Cal. Feb. 19, 2016).

the Secretary was capable of redressing the plaintiffs' injuries. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020). Florida statutory law ties the order of candidates on general election ballots to the performance of their political party in the previous gubernatorial election and is implemented by Florida's sixty-seven county supervisors who prepare the ballots. *Id.* at 1241–42. The *Jacobson* plaintiffs asserted that the State's laws violated the First and Fourteenth Amendments and sued the Secretary of State for declaratory and injunctive relief. In holding that the Plaintiffs lacked standing, the Eleventh Circuit emphasized that the Florida Secretary of State's responsibility for "general supervision and administration of the election laws does not make the order in which candidates appear on the ballot traceable to her." *Id.* at 1254 (internal quotation marks and citation omitted). "Instead, any injury would be traceable only to 67 Supervisors of Elections and redressable only by relief against them." *Id.* at 1253. The same reasoning applies in this case because the Secretary's general supervisory role does not include the authority to order the counties to accept e-fax or fax ballots from voters with print disabilities.

## II. THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR A MANDATORY INJUNCTION THAT IMPLICATES THE STATE'S ADMINISTRATION OF AN IMMINENT ELECTION.

Federal courts are especially reluctant to issue mandatory injunctions when doing so would interfere with a state's administration of an imminent election. The law "recognizes that election cases are different from ordinary injunction cases[,]" and that "[i]nterference with impending elections is extraordinary[.]" *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (en banc) (per curiam) ("*Southwest Voter*"). This limitation flows, in part, from the uncontroversial fact that "state and local election officials need substantial time to plan for elections," as well as the related observation that "[r]unning elections state-wide is extraordinarily complicated and difficult." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (granting stay) (Kavanaugh, J., concurring).

District courts must weigh "considerations specific to election cases" when deciding such applications, *Purcell*, 549 U.S. at 4, and the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam)

16

1  (granting stay); *see also Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring) (collecting cases).

2  The presumption against federal judicial intervention in imminent state elections is so strong that

3  it "sometimes require[s] courts to allow elections to proceed despite pending legal challenges."

4  *Riley v. Kennedy*, 553 U.S. 406, 426 (2008).

5         Courts around the country consistently invoke this well-established principle to deny

6  requests for mandatory preliminary injunctions. A district court in the Southern District of

7  Indiana, for example, denied a request for a preliminary injunction that would have compelled the

8  state to provide an electronic marking and ballot return option to voters with print disabilities. In

9  *American Council of the Blind of Indiana*, 2022 WL 702257, at *6, the plaintiffs filed a motion

10  for a preliminary injunction in the first week of February 2022, seeking an order requiring the

11  state of Indiana to implement electronic marking and return in time for a May 2022 primary

12  election. *See id.* at *1–3. Invoking *Purcell*, the Indiana court concluded that the plaintiffs'

13  requested relief was "too disruptive, and too close in time to the election, to be permissible." *Id.* at

14  *6.[6]

15         Likewise, in *Southwest Voter*, an en banc Ninth Circuit opinion affirmed a district court's

16  decision to deny a preliminary injunction where the plaintiffs asserted that California's then-

17  operative punch-card voting system was inaccurate and violated the Equal Protection Clause. *See*

18  344 F.3d at 917. The Ninth Circuit emphasized that "a federal court cannot lightly interfere with

19  or enjoin a state election[,]" and observed that such an order is "so serious that the Supreme Court

20  has allowed elections to go forward even in the face of an undisputed constitutional violation." *Id.*

21  at 918. Even after concluding that the *Southwest Voter* plaintiffs had established a possibility of

22  success on the merits, the Ninth Circuit found that the "public interest is significantly affected"

23  and denied relief. *Id.* at 919.

24         Although the Supreme Court has not issued hard and fast rules for judicial discretion in this

25  area, it has recognized that "[c]hanges that require complex or disruptive implementation" require

26  the most advanced planning. *See Merrill*, 142 S. Ct. at 881 n.1 (Kavanaugh, J., concurring). That

---

27  [6] The Indiana plaintiffs also sought unique relief from an idiosyncratic Indiana rule that is not at
28  issue in this case. The court granted a preliminary injunction with respect to that rule because the
   order merely required the state to stop the challenged practice and imposed no new requirements.

is emphatically the case here. *See generally* Robinson Decl. ¶¶ 34–42. Implementing an e-fax return option would require the Secretary to facilitate the creation of a new system of mail-ballot return that differs from regular fax return in significant ways. *See* Robinson Decl. ¶ 34. The Secretary would have no statutory authority to certify such a system because it would be neither a "voting system" nor an "RAVBM" within the meaning of California law, short-circuiting the procedural and substantive guardrails of the certification process. *Id.* ¶ 35. Even if the Secretary *could* certify such a system, the process ordinarily takes many months and can costs upwards of $500,000. *See id.* ¶ 8. Plaintiffs' request would also require a new process for capturing and verifying electronic signatures. *See id.* ¶ 20. Any new "e-return" or digital signature process would raise special concerns related to the security of Internet voting and digital forgery, necessitating additional testing and validation. *See id.* ¶¶ 20, 35.

And of course, all of these changes would require significant work on the part of 58 different counties with widely disparate technological capacities, staff sizes, and resources. *See id.* ¶¶ 36–40. Each county would need to ensure that it had sufficient technological infrastructure, policies and procedures, training, and personnel in place to reliably verify voters' electronic signatures and duplicate a potentially large number of additional paper cast vote records to official ballots, within the few months that remain until the November election. *See id.* The counties would also need to engage in significant outreach to voters, including through the preparation of print and web materials in a number of languages, explaining the new system and who is eligible to use it. *See id.* Because the State does not track the number of voters with disabilities, it is impossible to ascertain the scope of these new administrative burdens, though they would be felt most acutely in counties that do not presently have significant numbers of (or any) UOCAVA voters. *See id.* ¶42. In other words, Plaintiffs propose a "complex" change requiring "disruptive implementation[.]" *Merrill*, 142 S. Ct. at 881 n.1 (Kavanaugh, J. concurring). For this reason, Plaintiffs' case is distinguishable from those where an injunction "does not affect the state's election processes or machinery." *Cf. Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 368 (9th Cir. 2016) (en banc) (granting injunction pending appeal).

1    California's RAVBM system has been in place since 2017. The State's vote-by-mail rules

2    were established even longer ago. Both sets of rules contemplate paper materials (paper ballots in

3    the case of vote-by-mail, and paper cast vote records in the case of RAVBM) and handwritten

4    signatures. But Plaintiffs waited until March of this year to file this suit, even while the lawyers

5    and organizations representing Plaintiffs in this case began filing nearly identical litigation in

6    other states as early as 2020—four years before the upcoming November election. *See, e.g.*, *Am.*

7    *Council of the Blind of Indiana*, 2022 WL 702257, at *1 (noting plaintiffs filed suit on December

8    3, 2020). The upshot is that Plaintiffs have had ample opportunity to remedy their claimed

9    injuries in advance of the election but chose not to do so. Now, it is too close to the election for

10   the State to securely develop, test, and implement the changes Plaintiffs seek.

11   **III.    PLAINTIFFS HAVE FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE**
12   **        MERITS.**

13       Even if the Secretary were the proper defendant, and even if the *Purcell* rule did not

14   strongly counsel in favor of denying their requested mandatory injunction, Plaintiffs have not

15   established a sufficient likelihood of success on the merits of their claims for at least two reasons.

16   ***First***, the State provides "meaningful access" to the vote-by-mail system for voters with print

17   disabilities through the existing RAVBM program, especially because voters without print

18   disabilities who use that program are also required to acknowledge that election workers will see

19   their choices during the duplication process. ***Second***, Plaintiffs' request for "e-return" and

20   electronic signatures amount to fundamental alterations of the vote-by-mail program, in excess of

21   the ADA and Section 504's requirements.

22       "To prove that a public program or service violated Title II of the ADA, a plaintiff must

23   show: (1) he is a 'qualified individual with a disability'; (2) he was either excluded from

24   participation in or denied the benefits of a public entity's services, programs, or activities, or was

25   otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or

26   discrimination was by reason of his disability." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135

27   (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001) (internal quotation marks omitted).

28   For purposes of this motion, the Secretary does not dispute that Plaintiffs are qualified individuals

19

with disabilities and agrees that their ADA, Section 504, and Government Code claims may be analyzed together. *See* Mot. at 13, 14.

### A.   Plaintiffs have meaningful access to the vote-by-mail program.

The Elections Code provisions establishing the vote-by-mail program are facially neutral and Plaintiffs do not contend that California's vote-by-mail program is intentionally discriminatory. "[T]o challenge a facially neutral government policy on the ground that it has a disparate impact on people with disabilities, the policy must have the effect of denying meaningful access to public services." *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013).

Plaintiffs acknowledge that they may receive their ballots electronically through the State's RAVBM system and then mark them privately and independently using assistive technologies like screen readers and sip-and-puff devices.[7] *See, e.g.*, Mot. at 2 ("certain voters with print disabilities who access [] the required technology may receive, read, and mark their ballots independently using their county's [RAVBM] system"). Plaintiffs do not dispute that they have equal access to this system, which is explicitly designed to facilitate the process for voters with disabilities. Plaintiffs may also vote completely privately and independently using assistive devices connected to accessible voting systems at their polling places on election day. Robinson Decl. ¶ 13. The State does more than merely provide ballot access "in some way, shape, or form." *Cf.* Mot. at 4 (quoting *United Spinal Ass'n v. Bd. of Elections in N.Y.C.*, 882 F. Supp. 2d 615, 623 (S.D.N.Y. 2012)).

Plaintiffs, however, contend that the State's RAVBM system deprives them "of the same opportunity to vote privately and independently through California's Vote-by-Mail Program that is available to voters without such disabilities[.]" Mot. at 3. But, they do not address the fact that California UOCAVA voters *without* disabilities who use fax return must *waive their right to a secret ballot*. Robinson Decl. ¶ 33; Ex. D. In other words, the very accommodation Plaintiffs seek

---

[7] As Plaintiffs explain in their motion, sip-and-puff devices "enable a person to use compatible computerized and electronic equipment by making sipping and blowing motions with their mouth/breath and not requiring use of their hands and arms." Mot. at 3 n.2.

1    to expand already requires anyone who uses it to waive their right to a secret ballot, the disparate

2    impact Plaintiffs identify in their motion.

3        Although the secrecy waiver requirement impacts voters' ability to vote completely

4    privately, it is consistent with long-standing precedent upholding basic election administration

5    rules. *See Bridgeman v. McPherson*, 141 Cal. App. 4th 277, 284–85 (2006) (upholding

6    UOCAVA secrecy waiver requirement). As the Supreme Court has explained, while "voting is of

7    the most fundamental significance," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal

8    quotation marks omitted), "as a practical matter, there must be a substantial regulation of

9    elections if they are to be fair and honest and if some sort of order, rather than chaos, is to

10   accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). This means

11   that "[e]lection laws will invariably impose some burden upon individual voters." *Weber v.*

12   *Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) (quoting *Burdick*, 504 U.S. at 433). Federal law

13   reflects this reality. The Voting Rights Act, for example, contemplates that some voters will

14   require "assistance to vote by reason of blindness, disability, or inability to read or write[.]" 52

15   U.S.C. § 10508.

16       Here, the State has already embraced modifications of its vote-by-mail program that permit

17   voters with print disabilities to receive their ballots electronically and mark them at home using

18   their own assistive technology. *See Robinson Decl.* ¶ 22. Because they can review and mark their

19   ballots at home using their own assistive technology, Plaintiffs need not rely on anyone else to tell

20   them what is on their ballot, nor need they disclose their choices to anyone else in order to mark

21   their ballot. To the extent that the paper cast vote record return process may require limited

22   assistance that could impact voter privacy, the possibility of that assistance is in fact already

23   contemplated by amendments to the Voting Rights Act that predate the ADA by almost a decade.

24   *Compare* Pub. L. 97-205, § 5 (June 29, 1982) (enacting predecessor to 52 U.S.C. § 10508) *with*

25   Pub. L. 101-336, Title II, § 202 (July 26, 1990) (enacting Title II of the ADA); *see also Miles v.*

26   *Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts "assume that Congress is aware of existing

27   law when it passes legislation").

28

Viewed through the lens of the practical requirement that "there must be a substantial regulation of elections," *Storer*, 415 U.S. at 730, the RAVBM system provides Plaintiffs with meaningful access to the vote-by-mail program. *See, e.g.*, *Am. Ass'n of People with Disabilities v. Shelley*, 324 F. Supp. 2d 1120, 1126 (C.D. Cal. 2004) (holding that decertification of certain voting machines did not give rise to ADA violation). This is particularly true where Plaintiffs' own proffered accommodation would not solve the problem they have identified in their Complaint.

### B.   Plaintiffs request a fundamental alteration of the vote-by-mail program.

Even if the Court concludes that the existing RAVBM system fails to provide Plaintiffs with meaningful access to the vote-by-mail program, the breadth of the change Plaintiffs request would fundamentally alter California's vote-by-mail program and thus goes beyond the kind of accommodation required by the ADA and Section 504.

"The ADA requires 'only "reasonable modifications" that would not fundamentally alter the nature of the service provided.'" *Where Do We Go Berkeley*, 32 F.4th at 862 (quoting *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)); *see also* 28 C.F.R. § 35.130(b)(7)(i) (modification that would "fundamentally alter the nature of" the challenged program not required). This means that the State is not required to undertake changes that "would impose an undue financial or administrative burden," among other things. *Where Do We Go Berkeley*, 32 F.4th at 862.

Plaintiffs suggest that their requested relief is "certainly" not a fundamental alteration because, they claim, it "may primarily be implemented using preexisting processes and procedures in all California counties." Mot. at 18–19. Particularly to the extent Plaintiffs seek "e-fax" return over the Internet, this is flatly incorrect. Indeed, the Secretary understands Plaintiffs to be asking the Court to order two changes that would have wide-ranging impacts for California's vote-by-mail program and pose serious risks for the security and integrity of California's elections.

*First*, any change displacing the Elections Code's wet-ink signature requirements would fundamentally alter the way California verifies vote-by-mail ballots. *See* Robinson Decl. ¶ 20. California's vote-by-mail program does not currently permit *any* voter to sign or otherwise certify

22

their ballot electronically. *Id.* California would need to ensure every county established acceptable processes and procedures for collecting comparison electronic signatures, verifying the legitimacy of those signatures, and providing voters with the ability to cure possible defects in their electronic signatures. *See id.* ¶¶ 20, 38. Electronic signatures may also be susceptible to new and different concerns related to forgery or misuse, because they are generated by computers instead of by hand. *See id.* ¶ 20. County elections officials would need additional technological infrastructure and training on the process for verifying electronic signatures. Although it is impossible to say how large this burden might be because the number of potential voters with print disabilities is unknown, the magnitude of this burden would vary greatly amongst the counties, with the largest burden falling on counties with the smallest staff and fewest resources. *See id.* ¶¶ 41–42.

**Second**, any form of ballot return where voter choices are transmitted over the Internet would represent a sea change in California's electoral process. For more than a decade, the California Legislature has repeatedly made the conscious decision to avoid the clear and obvious risks associated with exposing voter choices to the public Internet, where bad actors could easily access and manipulate them. *See* Green Decl. Ex. A (Cal. Assembly Bill 1929, Assembly Concurrence in Senate Amendments (Aug. 24, 2012)); Robinson Decl. ¶ 28.

Indeed, in 2007 the Secretary of State's Office conducted a top-to-bottom review of the State's voting systems that included an assessment from researchers at the University of California. *See* Green Decl. Ex B (Cal. Assembly Bill 3026, Assembly Comm. on Elec. & Redistricting, April 10, 2008). Recall that "voting systems" are systems that allow voters to cast votes, that tabulate votes, or both. § 362. The Secretary's review urged the State to ensure that voting systems avoid connecting to the Internet. *See* Green Decl. Ex. B. The Legislature, following that advice, amended the Elections Code to forbid Internet connections for voting systems in the 2007–2008 Session through an urgency bill. *See id.* The Assembly explained that the law would "ensure the integrity and security of electronic voting machines," and emphasized that "*this bill would prohibit such connections from being permitted without future action by the Legislature.*" *Id.* (emphasis added). Current law states plainly that voting systems may not

connect to the Internet. § 19205(a). The Secretary is prohibited from certifying *any* voting system or RAVBM system that is capable of transmitting voter choices over the Internet. Robinson Decl. ¶ 28.

The Legislature's position on Internet voting has not changed since 2007. Indeed, when the Legislature adopted a predecessor statute to the current RAVBM rules, AB 1229, the Senate amended the draft bill to include the current prohibitions on storage or transmission to a remote server. *See* Green Decl. Ex. A. The Legislature explained that "[t]hese prohibitions . . . provid[e] a greater level of security and reduc[e] the threat of data manipulation." *Id.*

The State's current, bright-line prohibition on Internet voting represents the Legislature's well-supported judgment that the risks to election integrity outweigh the potential improvements in access for some voters. Allowing any group of voters to return their ballots via the Internet would represent a wholesale departure from that policy. *See Shavelson v. Bonta*, 608 F. Supp. 3d 919, 927 (N.D. Cal. 2022) (holding requested relief amounted to fundamental alteration where change altered program that reflected "the culmination of a multi-year process during which the California Legislature, Governor, and public debated the options that should be available").

While the Legislature is free to implement broad revisions to the State's elections infrastructure if it deems them wise policy, the ADA and Section 504 do not contemplate that such significant changes will be judicially ordered as reasonable accommodations. Because Plaintiffs' requested relief would fundamentally alter the way counties verify and collect mail ballots, in a manner that is inconsistent with the will of the California Legislature, the Court should decline to order them under the disability laws.

## IV.   THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH IN FAVOR OF DENYING PLAINTIFFS' MOTION

"A State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell*, 549 U.S. at 4 (quoting *Eu v. San Francisco Cnty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989)). This interest extends beyond the obvious concerns associated with fairness for candidates and their supporters, not to mention accuracy in the results; an election system that is vulnerable, or which is open to criticism as *potentially vulnerable*, "breeds distrust

24

of our government." *Purcell*, 549 U.S. at 4. The Court need look no further than the fact that, even several years after the 2020 election, a significant percentage of Americans believe President Biden was illegitimately elected.[8]

Replacing wet-ink signatures with electronic ones and implementing e-return (or expanding traditional fax return) increases the risk of potential compromise of election results. *See* Robinson Decl. ¶¶ 20, 28. This risk only increases with the number of ballots exposed to the Internet or subject to electronic signature. The State has strong interests both in mitigating actual risks to election integrity and ensuring public confidence in the election's results. These risks are particularly acute where, as here, Plaintiffs seek to compel significant, complex changes shortly before the general election—a timeline that will prevent complete vetting prior to the election.

It goes without saying that Plaintiffs have advanced weighty interests of their own. The Secretary will continue to support ballot accessibility initiatives that are consistent with the Elections Code and the Legislature's policy judgments. However, the nature of Plaintiffs' requested relief means that "[t]he public interest is significantly affected." *Southwest Voter*, 344 F.3d at 919. Weighing these interests against one another, the Court should avoid issuing a mandatory injunction that will generate significant implementation, administration, and security concerns and which may erode public confidence in the forthcoming election.

## CONCLUSION

Secretary Weber does not have the authority to unilaterally enact the changes Plaintiffs seek and cannot redress Plaintiffs' claimed injuries. The Court therefore lacks jurisdiction. The presumption that federal courts should refrain from interfering in a state's administration of an imminent election also counsels in favor of denying Plaintiff's request. Moreover, the changes Plaintiffs seek would fundamentally alter the State's vote-by-mail program, to which Plaintiffs have meaningful access. Large modifications should not be made in haste. Significant adjustments take time, careful testing, and investment of resources. The Court should decline Plaintiffs' invitation to order them without those safeguards here.

---

[8] A January 2024 poll conducted by the University of Massachusetts found that 30% of respondents believed President Biden's election was either "probably" or "definitely not legitimate." *See* https://tinyurl.com/ywhhx6c8.

1    Dated:  April 25, 2024                          Respectfully submitted,

2                                                    ROB BONTA
                                                     Attorney General of California
3                                                    MARK BECKINGTON
                                                     Supervising Deputy Attorney General
4                                                    JANE E. REILLEY
                                                     Deputy Attorney General
5

6

7                                                    /s/ Nicholas R. Green
                                                     NICHOLAS R. GREEN
8                                                    Deputy Attorney General
                                                     *Attorneys for Defendant*
9                                                    *Secretary of State Shirley N. Weber Ph.D.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (3:24-cv-01447-SK)

# CERTIFICATE OF SERVICE

Case Name:   *California Council of the Blind, et al. v. Shirley N. Weber*
Case No.     **3:24-cv-01447-SK**

I hereby certify that on <u>April 25, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### CALIFORNIA SECRETARY OF STATE SHIRLEY N. WEBER, PH.D.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 25, 2024</u>, at San Francisco, California.

| G. Pang | |
| --- | --- |
| Declarant | Signature |

SA2024301128/44142517.docx